**SEA STAR LINE, LLC, a limited liability company, Plaintiff,**

v.

**EMERALD EQUIPMENT LEASING, INC., a corporation, Defendant.**

**Civ. Act. No. 05–245–JJF.**

United States District Court, D. Delaware.

Aug. 27, 2009.

---

Timothy J. Armstrong, Esquire of Armstrong & Mejer, P.A., Miami, FL, Kathleen M. Miller, Esquire of Smith, Katzenstein & Furlow, LLP, Wilmington, DE, for Plaintiff.

Gary M. Schildhorn, Esquire and Alan I. Moldoff, Esquire of Adelman Lavine Gold and Levin, A Professional Corporation, Philadelphia, PA, Ronald S. Gellert, Esquire, Tara L. Lattomus, Esquire and Margaret F. England, Esquire of Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE, for Defendant.

## *MEMORANDUM OPINION*

FARNAN, District Judge.

By an Opinion and Order entered on September 19, 2008, the Court adjudicated the claims advanced by Plaintiff Sea Star Line LLC ("Sea Star") against Defendant, Emerald Equipment Leasing, Inc. ("Emerald"), and denied Sea Star's request for declaratory relief. (D.I. 220, 221). On March 17 and 18, 2009, the Court held a two-day bench trial on Emerald's counterclaims against Sea Star. This Memorandum Opinion incorporates the Court's previous Findings of Fact and Conclusions of law, to the extent they are applicable, and renders additional Findings of Fact and Conclusions of Law on the issues tried before the Court with respect to Emerald's counterclaims specifically.[1]

---

1. The background of this litigation is set forth fully in the Court's September 19, 2008 Opinion.

## I. FINDINGS OF FACT

Sea Star's use of Emerald's equipment was initially governed by an e-mail dated May 2, 2002. Tr. Exh. 70; Tr. Vol. 1 at 85, 125–126.[2] This e-mail was superseded by the Rental Agreement executed by the parties on July 31, 2002. Tr. Exh. 17, Tr. Vol. 1 at 86–87, 129. By its terms, the Rental Agreement covered equipment in use by Sea Star as of April 29, 2002.

Initially, there was a great deal of confusion regarding Sea Star's use of Emerald's equipment. Tr. Vol. 1 at 131–132; Tr. Exh. 71–72. Sea Star was not required to give Emerald advance notice before using Emerald's equipment, the equipment was scattered all over the United States and the Carribean in port facilities, terminals, on ships, in depots, on trucks, railroad trains and in customer facilities, and Sea Star was not required to execute a document or receipt prior to using Emerald's equipment. Tr. Vol. 1 at 74–74, 76, 126–127, 131–32; Tr. Vol. 2 at 11.

To provide some type of notice to Emerald and to account for Sea Star's use of the equipment, Sea Star admits that it undertook to provide monthly "self-billing reports." Tr. Vol. 1 at 18–20, 77–78, 127–128, Tr. Exh. 61. Although Sea Star admits that it had a duty to accurately account for the use of Emerald's equipment, it also concedes that its self-billing reports were not accurate. Tr. Exh. 68 at Request For Admission No. 8, 9, 33; Tr. Vol. 1 at 79–81; Tr. Vol. 2 at 42. However, there are certain documents that provide evidence of Sea Star's use of Emerald's equipment, including by way of example, trailer interchange receipts ("TIRs"), gate logs and inventories. Tr. Vol. 1 at 75–76, 65–70, 117–118. Sea Star created these documents but did not provide them to Emerald at the time Sea Star used the equipment. Tr. Vol. 1 at 76–77.

To assist in tracking the equipment, Emerald asked Mark Levins, its computer programmer in the area of equipment control for container terminals, to create a program for Emerald to track the last location of its equipment as of May 31, 2002. CCTr. Vol. 1 at 9, 12. This program provided a snapshot of equipment location on a particular day, and used three files of information: a daily file of information gathered by Sea Star and its predecessor, a file of information gathered by the Packer Avenue Terminal when Emerald equipment passed through its gates, and information gathered by the San Juan terminal in similar circumstances. CCTr. Vol. 1 at 9–14, 17–19, 34. Manual entries could also be made into the report by an Emerald Representative, and the program provided a means for CSX Railroad and the Packer Marine Terminal in Philadelphia to provide Emerald with information. The report generated by Mr. Levins's program is referred to as a "move history." CCTr. Vol. 1 at 16–17.

The move history identifies the shipping lines whose equipment was moving in and out of the terminals in question, and each piece of equipment indicated on the move history has an identifying number or prefix. CCTr. Vol. 1 at 47–48. Because the information used by Mr. Levins to create the move histories came from shipping lines in the ordinary course of their duties, it was in the best interest of those shipping lines to ensure the accuracy of the information provided. CCTr. Vol. 1 at 55–57.

In addition to Mark Levins's role, Emerald enlisted the help of Lorraine Robins to monitor Emerald's equipment. CCTr. Vol. 1 at 59–60. Ms. Robins initially relied on

---

**2.** Trial transcripts and exhibits from the trial on Sea Star's Complaint are designated "Tr." and "Tr. Exh.," respectively. Trial transcripts and exhibits from the trial on Emerald's counterclaim are designated "CCTr." and "CCTr. Exh.," respectively.

Sea Star's self-billing reports to show the rent owed by Sea Star pursuant to the Rental Agreement; however, Ms. Robins began receiving information that Sea Star's usage of Emerald Equipment was exceeding that which was being shown on their self-billing reports. CCTr. Vol. 1 at 62–63. Ms. Robins notified Sea Star of the discrepancies and began preparing additional bills for this additional usage, as well as for stipulated losses. CCTr. Vol. 1 at 63.

After receiving the information from Ms. Robins, Sea Star began preparing its own analysis of its equipment usage (the "Rooks Analysis"). CCTr. Vol. 1 at 70, CCTr. Exh. 9. Ms. Robins reviewed the Rooks Analysis and saw that it was inconsistent with Sea Star's self-billing reports. CCTr. Vol. 1 at 70–72. Ms. Robins then prepared new invoices incorporating all the information she had, which included in addition to the Rooks Analysis and move history information, schedules of certain equipment acknowledged by Marty McDonald, John Allen Jacksonville inventories, IQ ship information, truck invoices, files attached to a George Cervone e-mail showing Schedules of Emerald equipment which became active in the Sea Star system between April 19, 2002 and May 15, 2002, and the documents provided during the discovery in this litigation. CCTr. Exh. 8, 10–18; 20–21; Tr. Exh. 9. An invoice was prepared for every piece of Emerald equipment for which "movement" could be ascertained after April 29, 2002. CCTr. Vol. 1 at 90–91, 155–156. According to Ms. Robins, "movement" meant that she had evidence that an Emerald piece of equipment went in or out of a terminal or depot, or on or off a ship after April 29, 2002 when the Rental Agreement commenced. CCTr. Vol. 2 at 31–32. For each piece of equipment, Ms. Robins prepared a packet of information containing either references or the actual documents involved to support the invoices. CCTr. Vol. 1 at 91–103; CCTr. Exh. 22A–D. The work in preparing Emerald invoices and compiling the data packets encompassed approximately 6,500 pieces of equipment and involved several people working over a five to six year period of time. CCTr. Vol. 1 at 91.

Despite knowledge that its self-billing reports were inaccurate, Sea Star has never corrected or reissued its self-billing reports. Tr. Vol. 1 at 225, Vol. 2 at 44, 63; CCTr. Vol. 2 at 63; CCTr. Vol. 1 at 108, Vol. 2 at 44–45, 68. Sea Star has only responded to specific inquiries from Emerald regarding specific pieces of Equipment identified by Emerald, even though Sea Star maintained its own analysis of equipment entitled, "Evaluations of the Emerald Equipment that sailed from 4/26/02 to 8/31/03 that was not on any Sea Star Self-billing Report or on the Emerald Claims." CCTr. Vol. 2 at 64–65. Sea Star has admitted that it never reported more than 60% of what Emerald's Invoices indicate were uses of Emerald's equipment. CCTr. Exh. 7; CCTr. Vol. 1 at 108–110.

## II. CONCLUSIONS OF LAW

As a threshold matter, the parties appear to agree on the application of Maryland law to the breach of contract issues raised by Emerald's counterclaims. In this regard, Paragraph 14 of the Rental Agreement provides that, "[t]his Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland."

As for Emerald's tort claims, however, the parties' briefs are less than clear. In its decision on Sea Star's Motion To Dismiss, the Court noted that the parties never specifically alleged which state's substantive law applies to Emerald's tort claims. 2006 WL 214206, *9 n. 5 (D.Del. Jan. 26, 2006). In its Post Trial Opening

Brief, Emerald contends, consistent with its argument during the motion to dismiss stage of these proceedings, that the Court should apply federal common law to tort claims in maritime actions, such as this, and that when no admiralty law is on point, the Court can look to "other state law." (D.I. 260 at 11 n. 5.) Emerald never specifically identifies the "other state law" it seeks to apply; however, both parties focus their briefs on Maryland law in the first instance. Accordingly, the Court will base its decision on the application of Maryland law.

### A. Whether Emerald Has Established A Breach Of The Rental Agreement Based On Sea Star's Failure To Pay Rent

■ Paragraph 3 of the Rental Agreement provides:

3. *Rental.* Lessee shall pay rent and all charges under this Agreement on a monthly basis. Each payment for particular Equipment will become due on the tenth day of the month following the month of use, unless the parties otherwise agree in writing. In the event Lessee fails to make timely payment, interest shall be due on any overdue amount at a rate of eighteen percent (18%) per annum, commencing ten (10) days after Lessee receives Lessor's invoice for such overdue amount. With respect to particular Equipment, Lessee's obligations to pay rent and other charges shall terminate immediately if Lessee purchases and pays for such Equipment.

The Rental Agreement further describes an event of default as the "[c]ontinuing failure to pay rent for thirty (30) days after its due date under this Agreement."

Sea Star has admitted that it has used Emerald's equipment and failed to pay rental charges for that use. The Court concludes that this failure to pay rent con-

stitutes a breach of the Rental Agreement. Sea Star reiterates its argument based on paragraph 4(b) of the Rental Agreement that Emerald is not the real party in interest for purposes of the per diem rental claims against Sea Star, but the Court has already rejected Sea Star's argument in the context of its previous opinion. 578 F.Supp.2d 679, 686–687 (D.Del.2008).

With respect to the issue of prejudgment interest, the Court concludes that the parties have insufficiently briefed this issue so as to allow the Court to render a decision. Article III, Section 57 of the Maryland Constitution provides that "The Legal Rate of Interest shall be Six percent per annum; unless otherwise provided by the General Assembly." In its briefing, Sea Star cites to this provision and *Stroh v. Omni Arabians, Inc.*, 131 Md.App. 178, 748 A.2d 1015 (Md.Ct.Spec.App.2000), for the proposition that prejudgment interest should be limited in this case to six percent. Emerald does not distinguish *Stroh* and cites to a case predating *Stroh* from the same court, *MLT Enterprises, Inc. v. Miller*, 115 Md.App. 661, 694 A.2d 497, 505 (Md.Ct.Spec.App.), *cert. denied*, 347 Md. 154, 699 A.2d 1168 (1997). Neither party discusses the primary case from Maryland's highest court, *United Cable TV. of Balt. Ltd. P'shp v. Burch*, 354 Md. 658, 675, 732 A.2d 887 (Md.1999), and neither party discusses any legislative enactments that may affect an award of prejudgment interest. *See, e.g.*, MD Code, Commercial Law, § 14–1315. Accordingly, at this juncture, the Court will not award prejudgment interest. To the extent that Emerald wishes to pursue a claim for prejudgment interest, it should file a separate Motion and detailed Opening Brief addressing the pertinent issues, and full briefing should then continue by both parties. If prejudgment interest is ultimately awarded, the Court will amend the Judgment Order entered in this case.

■ As for reasonable attorneys' fees and costs, the Court concludes that Emerald is entitled to such fees and costs incurred as a result of this litigation pursuant to paragraph 11 of the Rental Agreement. In pertinent part, Paragraph 11 of the Rental Agreement provides:

11. *Indemnification and Expenses.*

(a) Lessee shall defend, indemnify and hold Lessor, its agents and employees, harmless from all claims, causes of action, liability damages or loss (including expenses in connection with any claim or suit, such as reasonable attorneys' fees and court costs) arising out of (a) failure by Lessee to comply with its obligations under this Agreement or any attempt by a third party to impose on Lessor liability for Lessee's acts or omissions . . .

Although Sea Star contests the payment of attorneys' fees, it makes no substantive argument to the contrary, focusing instead on the payment of punitive damages. Accordingly, the Court finds no reason to depart from the parties' agreed upon terms of the Rental Agreement, which clearly provide for the payment of attorneys' fees to Emerald for breach of the Agreement by Sea Star.

In sum, the Court concludes that Emerald has established that Sea Star breached the Rental Agreement, and that as a result of this breach, Emerald is entitled to attorneys' fees and costs. Accordingly, the Court will enter judgment in favor of Emerald and against Sea Star on its breach of contract counterclaim.

B. *Whether Emerald Has Established A Breach Of The Rental Agreement Based On Sea Star's Failure To Pay Stipulated Loss Values*

■ Paragraph 9(a) of the Rental Agreement provides:

9. *Risk of Loss*

(a) During the term of this Agreement, Lessee shall bear all risk of loss, damage, theft, or destruction of the Equipment. No such loss, damage, theft, or destruction of equipment in whole or in part, shall impair Lessee's obligations under this Agreement, all of which shall continue in full force and effect. At Lessor's option and subject to Schedule "A," Lessee shall (i) put the affected Equipment in the condition that existed upon delivery to Lessor or (ii) pay Lessor an amount equal to all accrued and unpaid rent due under this Agreement, together with the Stipulated Loss Value, with respect to the affected Equipment, less the amount of all recoveries by Lessor from parties other than Lessee for such loss, damage, theft or destruction.

Paragraph 10(f) of the Rental Agreement further provides:

10. *Redelivery of Equipment*

(f) If Lessee fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor notice, Lessor may elect to treat such Equipment as lost; and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

After reviewing the evidence adduced at trial, the Court finds that Sea Star failed to timely return certain pieces of Emerald Equipment as required by the Rental Agreement. The Court concludes that this establishes a breach of the Rental Agreement and pursuant to the terms of the Rental Agreement, Emerald was permitted to treat such equipment as lost and require Sea Star to pay a stipulated loss value for the equipment plus rental charges.

■ Sea Star contends that it should not be required to pay a stipulated loss value for equipment that Emerald subsequently sold in violation of Sea Star's notice rights under Paragraph 13(b)(iii) of the Rental Agreement. In pertinent part, Paragraph 13(b) provides:

13. *Events of Default.*

\* \* \*

(b) Upon the occurrence of any default by Lessee [Sea Star] under this Agreement, Lessor [Emerald] shall (except to the extent otherwise required by law) be entitled to:

\* \* \*

(iii) Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales. . . .

Because Emerald did not provide Sea Star with notice as required by this paragraph. Sea Star contends that if it is charged for Equipment that Emerald sold in violation of its notice rights under this provision, Emerald will "recover twice—first by selling recovered 'lost' equipment without prior notice; second, by collecting an adjusted stipulated loss values [sic] from Sea Star . . ." (D.I. 261 at 31).

In response, Emerald points out that any equipment it recovered was solely the result of Emerald's own efforts, a fact not disputed by Sea Star. Emerald further contends that it sold the equipment at fair market value and adjusted the stipulated loss invoices so that Sea Star was charged "*only* for the difference between the full stipulated loss value and the amount received for such pieces of equipment." (D.I. 260 at 15, emphasis in original). Emerald explains that although Sea Star was liable for the full stipulated loss value under the Rental Agreement, Emerald, by its own actions in locating and recovering this "lost" equipment, was able to reduce or mitigate any damages that Sea Star suffered. Thus, Emerald contends that its failure to give Sea Star notice of the sale is not a material breach because Sea Star's position was actually enhanced by Emerald's actions in selling the equipment and adjusting the stipulated loss value contractually owed by Sea Star.

In adjudicating the claims asserted by Sea Star in its Complaint against Emerald, the Court concluded that Emerald was required to give Sea Star notice before any public or private sale of the equipment, and that Emerald failed to comply with this contractual obligation. However, the Court specifically noted that not every breach of a contractual duty discharges the other party's duty to perform its obligations, and the Court reserved decision on the question of whether Emerald's breach was material such that Sea Star would be excused from its stipulated loss payment obligations under the Rental Agreement.

■■ A breach of contract is considered material if it affects the purpose of the contract in an important or vital way. *Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202, 209 (Md.1995). Materiality is determined in light of the facts and circumstances of each case. Restatement

(Second) Contracts § 241. Among the circumstances to be considered are:

 (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

 (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

 (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

 (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

 (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.*

Considering the facts and circumstances of this case as a whole and in light of the additional specific circumstances highlighted in the Restatement, the Court concludes that Emerald's breach of the Rental Agreement is not material. Emerald's failure to give Sea Star notice of the sale of the previously designated "lost" equipment did not result in any injury to Sea Star. Under the Rental Agreement, Sea Star agreed to pay a stipulated "loss" value for equipment not timely returned. Upon the sale of the equipment recovered by its own efforts, Emerald adjusted the agreed upon "loss" value to provide Sea Star with a credit which benefitted Sea Star by reducing the stipulated "loss" value it had contractually agreed to pay. Emerald's conduct in this regard comports with standards of good faith and fair dealing, and Sea Star cannot be said to have

been deprived of any benefit which it reasonably expected. In fact, because of Emerald's actions in recovering the "lost" equipment, Sea Star obtained a benefit it was not contractually entitled to in the form of a reduction of the loss value it would have otherwise been required to pay.

In sum, the Court concludes that Sea Star further breached the Rental Agreement by failing to pay the adjusted stipulated loss values owed to Emerald under paragraphs 9 and 10 of the Rental Agreement. Emerald's breach of the notice provision is not material, and did not excuse Sea Star's performance under the Rental Agreement. Accordingly, the Court will enter judgment in favor of Emerald and against Sea Star on Emerald's breach of contract counterclaim to the extent that claim is based upon Sea Star's failure to pay the adjusted stipulated loss values.

 C. *Whether Emerald's Invoices Satisfy Its Burden Of Proof To Establish Damages For Unpaid Rental Charges And Stipulated Loss Values*

Sea Star contends that Emerald has failed to carry its burden of proof on the issues of damages. In support of its argument, Sea Star contends that the invoices (CCTr. Exh. 8) prepared by Emerald are inadmissible under the Federal Rules of Evidence because they are inherently untrustworthy hearsay, and because they are based upon summaries which were not produced at trial.[3] Sea Star further contends that the lack of precision in calculating damages is attributable to Emerald's lack of expertise, destruction of pertinent materials and unwillingness to abide by

---

**3.** Because this evidentiary issue was specifically raised by Sea Star in its substantive briefing on damages, the Court will address it here. The remaining evidentiary objections raised by the parties will be addressed in Section III *infra* of this Memorandum Opinion.

the terms of the Rental Agreement and Sale Order. Thus, Sea Star contends that Emerald should not be excused from establishing damages with concrete certainty.

■ "Under Maryland law, once a plaintiff has proven with certainty the fact of damages resulting from the defendant's breach of contract, the amount of those damages 'may be left to reasonable inference.'" *M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 138 A.2d 350, 355 (1958). In this regard, damages may not be based on speculation or conjecture, but must be proven with "reasonable certainty." *Id.* The imposition of the "reasonable certainty" rule has given rise to several additional legal principles with particular applicability in this case, notably the following: (1) "where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty;" (2) "mere difficulty in ascertaining the amount of damage is not fatal;" (3) "mathematical precision in fixing the exact amount is not required;" and (4) "it is sufficient if the best evidence of the damage which is available is produced." *Id.* at 348–349, 138 A.2d 350.

■ In this case, the evidence demonstrates that Sea Star breached its obligation to provide Emerald with accurate self-billing reports. This breach directly gives rise to Emerald's inability to ascertain its damages with certainty, and therefore, Sea Star cannot now complain about that uncertainty. Based upon the testimony of Lorraine Robins, which the Court fully credits, the Court further finds that the Emerald invoices were based upon the best evidence available to Emerald, and the invoices are clearly relevant to ascertaining the amount of damages owed to Emerald. As Ms. Robins explained, she took painstaking and almost extraordinary measures to account for each piece of Emerald equipment, an undertaking which

lasted several years, and Ms. Robins took equally careful measures to ensure that Sea Star was credited for equipment which was later recovered by adjusting the stipulated loss values. The Court finds this testimony sufficient to lay a proper foundation for the invoice evidence. In addition, the Court notes that Federal Rules of Evidence 1006 permits the use of summaries of voluminous books, records or documents for the convenience of the Court, and as Emerald points out, the Court expected the parties to utilize such summary evidence. Accordingly, the Court is not persuaded that Emerald's invoices (CCTr. Exh. 8) should be excluded from evidence based upon Federal Rules of Evidence 401, 402, 701, 1002, 1003, and 1006.

■ As for Sea Star's hearsay objection, the Court concludes that even if the invoices cannot be said to be a business record kept in the ordinary course of business, since they were prepared, in part, with this litigation in mind, the Court is persuaded by Ms. Robins's testimony regarding her detailed collection and preparation methods, that the invoices bear a high degree of trustworthiness such that they should be admissible into evidence. Fed.R.Evid. 807. Accordingly, the Court concludes that the Emerald invoices (CCTr. Exh. 8) are admissible into evidence for the purpose of establishing the damages owed to Emerald by Sea Star.

D. *Whether Emerald Has Established That Sea Star's Accounting Of Damages Was Substantially Erroneous And Whether Emerald's Invoices Are Prima Facie Valid To Establish Damages*

Having concluded that Emerald's invoices are admissible evidence, the Court further credits those invoices as evidence establishing the amount of damages owed by Sea Star to Emerald. Indeed, the

Court finds, by Sea Star's own admission, that its accounting records are unreliable, and the Court is unpersuaded by Sea Star's arguments aimed at undercutting the accuracy of the Emerald invoices. Accordingly, the Court will accept Emerald's invoices as evidencing the amount of damages owed by Sea Star to Emerald as a result of Sea Star's breach of the Rental Agreement.

Having reached this conclusion, the Court further finds that separate proceedings for an accounting of damages is not necessary. Because Emerald has sufficiently established the amount of damages owed to it by Sea Star, the Court further concludes that Emerald's counterclaim for an accounting is moot and its Motion For Partial Summary Judgment for a partial damages award is likewise moot.

E. *Whether Emerald Has Established Tort Claims Based On Breach Of Fiduciary Duty And/Or Constructive Fraud*

Under Maryland law, breach of fiduciary duty is not considered a separate cause of action. *Vinogradova v. Suntrust Bank, Inc.*, 162 Md.App. 495, 875 A.2d 222, 231 (Md.Ct.Spec.App.2005); *Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc.*, 190 F.Supp.2d 785, 801 (D.Md.2002). Rather, a breach of fiduciary duty is incorporated into other causes of action. *Id.* The decision of the Maryland Court of Appeals in *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md.296, 389 A.2d 887, 903 (1978), is not to the contrary as Emerald contends, because that case discusses breach of fiduciary duty in the context of a claim for fraud. Accordingly, the Court will consider Emerald's allegations of breach of fiduciary duty in the context of its constructive fraud claim.

Before addressing Emerald's constructive fraud claim on the merits, however-

er, the Court must consider Sea Star's threshold argument under the independent legal duty doctrine. Specifically, Sea Star contends that Emerald cannot maintain a separate cause of action based on constructive fraud, because its fraud allegations are part and parcel of its breach of contract claim.

Sea Star raised this argument in the context of its Motion To Dismiss, and in its post-trial response, Emerald contends that the Court has already ruled on this issue. However, the Court's decision to allow Emerald's fraud claims to stand was rendered in the context of a Rule 12(b)(6) motion for failure to state a claim, and in so ruling, the Court expressly based its holding on the case law that was then cited by the parties, which included case law from Florida, Virginia and New Jersey cited by Emerald that established an exception to the economic loss doctrine for cases involving self-billing types of reports. 2006 WL 214206 at *9–10 & n. 5. At this juncture, however, the parties direct the Court to Maryland law, and the Court is not persuaded that such an exception exists under Maryland law. The parties have not identified any Maryland cases creating an exception to the general principle that the duty giving rise to the tort cause of action must be independent of the contractual obligation. *See, e.g., Jones v. Hyatt, Ins. Agency, Inc.*, 356 Md. 639, 741 A.2d 1099, 1107 (1999). Although the Rental Agreement does not contain a specific provision providing for Sea Star's self-billing obligation, the Court is persuaded, in the circumstances of this case and absent any clear exception under Maryland law, that Sea Star's self-billing obligation is inextricably intertwined with the Rental Agreement and Sea Star's obligation to pay rent provided for in the Rental Agreement. Accordingly, the Court concludes that Emerald cannot maintain a separate

cause of action based on tort for conduct which is part and parcel of its breach of contract claim.

 In the alternative, however, even if the Court recognizes an independent cause of action for fraud and/or constructive fraud under Maryland law, the Court concludes that Emerald has not established by clear and convincing evidence the elements of these claims. To establish fraud, Emerald must show:

(1) that a representation made by the defendant was false; (2) that either its falsity was known to the defendant or the misrepresentation was made with such reckless indifference to truth as to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff not only relied upon the misrepresentation but had the right to rely upon it with full belief in its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that the plaintiff suffered damage directly resulting from the misrepresentation.

*Appel v. Hupfield,* 198 Md. 374, 84 A.2d 94, 95–96 (1951). These elements must be proven by clear and convincing evidence. *VF Corp. v. Wrexham Aviation Corp.,* 350 Md. 693, 715 A.2d 188, 193 (1998). Constructive fraud differs from actual fraud in that constructive fraud "is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud." *Scheve v. McPherson,* 44 Md.App. 398, 408 A.2d 1071, 1076 (Md.Ct.Spec.App.1979) (citations omitted).

 With respect to fraud, the Court concludes that Emerald has not established by clear and convincing evidence the required intent to deceive. Emerald suggests that the magnitude of the misreporting in this case is sufficient alone to establish intent to deceive, but the Court is not persuaded that the volume of misreporting, without more, is sufficient to rise to the level of clear and convincing evidence of intent to deceive.

 Moreover, with respect to both fraud and constructive fraud, the Court is not persuaded that Emerald has established reliance by clear and convincing evidence. As Emerald explains in its own proposed findings of fact, Emerald took measures to track its own equipment shortly after Sea Star began leasing it. For example, Emerald hired Mr. Levins to write a computer program to find the last location of Emerald equipment and track the move history for each piece of equipment. Indeed, it was precisely this information that Ms. Robins used, in part, to recreate the invoices for Sea Star's usage. Indeed, Mr. Robins noticed the discrepancies in Sea Star's self-billing reports shortly after reviewing them, and began billing Sea Star directly for its unreported usage.[4] In the Court's view, this evidence undercuts Emerald's purported reliance. Accordingly, the Court concludes, that Emerald has not carried its burden of establishing fraud and/or constructive fraud

---

4. Although Ms. Robins testified that she initially relied on Sea Star's self-billing, it is evident to the Court from the trial testimony that any reliance by Emerald on Sea Star's self-billing was fleeting and was quickly replaced by a hearty skepticism regarding the accuracy of the billing, which in turn led Ms. Robins to notify Sea Star and invoice them directly. In making this observation, the Court is not suggesting that a specific period of reliance is necessary to establish a claim, but rather, that the evidence here undercuts reliance.

by clear and convincing evidence. Having concluded that Emerald cannot establish its tort claims, the Court further concludes that Emerald is not entitled to punitive damages. Accordingly, judgment will be entered against Emerald and in favor of Sea Star on Emerald's tort claims.

F. *Whether Emerald's Claims Are Barred By The Statute Of Limitations*

Sea Star contends that Emerald's claims are barred by the statute of limitations. Sea Star raised this argument previously in the context of Sea Star's Motion To Dismiss and Sea Star's Motion For Partial Summary Judgment. In both instances, the Court concluded that Sea Star failed to demonstrate that Emerald's claims were barred by the statute of limitations. *Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.*, 2008 WL 4761871 (D.Del. Oct. 29, 2008) (Report & Recommendation) (Stark, Mag. J.), adopted by, 2008 WL 5245346 (D. Del. Dec. 16, 2008); *Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.*, 2006 WL 956902 (D.Del. Apr. 13, 2006). Sea Star has not raised any new grounds in its post-trial briefing warranting reconsideration of the Court's previous conclusions.

## III. EVIDENTIARY OBJECTIONS

A. *Sea Star's Evidentiary Objections*

In addition to the objection to the Emerald invoices, Sea Star raises eight additional evidentiary objections. Specifically, Sea Star objects to (1) Emerald's Computer Print Out Move Histories (CCTr. Exh. 10), (2) the Docket for Adversary Proceeding No. 04–53071 in the United States District Court for the District of Delaware (CCTr. Exh. 1), (3) the Docket for Civil Action No. 3:04–146 in the United States District Court for the Middle District of Florida (CCTr. Exh. 2), (4) the Docket for this action (CCTr. Exh. 3), (5) the Complaint

for Recovery of Post–Petition Account Receivables filed by Emerald against Sea Star (CCTr. Exh. 4), (6) the Answers and Objections to Emerald's Interrogatories (CCTr. Exh. 6), (7) Sea Star's Supplemental Answers to Interrogatories No. 1 (CCTr. Exh. 7), and (8) the First Consolidated Amended Class Action Complaint No. 08–1467 filed in the United States District Court for the District of Puerto Rico (CCTr. Exh. 33).

 In its response, Emerald has withdrawn CCTr. Exh. 33. As for CCTr. Exhs. 1, 2, 3 and 4, the Court may take judicial notice of these documents pursuant to Fed. R. of Evid. 201, and the Court finds the documents to be relevant. Accordingly, the Court will overrule Sea Star's objections.

 As for the objections to CCTr. Exhs. 6 and 7, Sea Star's answers to Interrogatories, the Court concludes that these documents are admissible as admissions of a party opponent under Fed.R.Evid. 801(d)(2). The Court further finds the documents to be relevant. Accordingly, the Court will overrule Sea Star's objections.

With regard to the Emerald Move Histories (CCTr. Exh. 10), the Court concludes that this evidence is admissible under the business record exception to the hearsay rule based on the testimony of Mark Levins. (CCTr. Vol. 1 at 8–58.) The Court further finds the documents to be appropriate summaries under Fed. Rule of Evid. 1006, and the Court finds those documents to be relevant to Sea Star's admitted use of the equipment at issue. Accordingly, the Court will overrule Sea Star's objections.

B. *Emerald's Evidentiary Objections*

 Emerald maintains one evidentiary objection post-trial to CCTr. Exh. 109

offered by Sea Star, which is an inventory of equipment. Emerald contends that "[n]o evidence was presented as to who, how or when this exhibit ... was prepared and the document itself provides no such information." Emerald further contends that the document was not authenticated and to the extent it was offered for the truth of the matter asserted, no foundation was provided establishing that the business record exception applies.

In response, Sea Star contends only that this document is "[a]n inventory of equipment prepared by the Jacksonville Port Authority, used to show located [sic] of equipment and that Emerald did not consider this information." (D.I. 277 at ¶ 1.) Sea Star further contends that the document "is reliable for purposes offered." (*Id.*)

The Court has reviewed the exhibit and the related trial testimony and finds that Sea Star offered insufficient evidence to lay a foundation for the authentication and admissibility of this document. The document itself contains no information as to who, how or when it was prepared, and no trial testimony was offered to establish this information. In addition, no testimony was offered to establish that any hearsay exception applies to the document. In this regard, the Court further notes, that Sea Star has provided no trial citations to support its argument that the document is reliable for the purpose for which it was offered. Accordingly, the Court will sustain Emerald's objection to CCTr. Exh. 109.

## IV. CONCLUSION

For the reasons discussed, the Court will overrule Sea Star's evidentiary objections and sustain Emerald's objection to CCTr. Exh. 109. The Court will enter judgment in favor of Emerald and against Sea Star on Emerald's breach of contract counterclaim (Count I). The Court will further enter judgment in favor of Sea Star and against Emerald on Emerald's counterclaims based on fraud, constructive fraud, fraudulent concealment and breach of fiduciary duty (Counts IV–VIII). Emerald's request for an accounting (Count III) is dismissed as moot in light of the Court's conclusion regarding the credibility of Emerald's invoices.

With notice to Sea Star, Emerald shall submit a proposed judgment order, which includes a provision for the total amount of damages to be awarded to Emerald, to the Court within **five (5) days** of receipt of this Memorandum Opinion. Sea Star may stipulate to the proposed judgment order or file any objections to the proposed judgment order **within five (5) days** of its receipt of the proposed order. Emerald shall have **five (5) days** from the receipt of any objections to file a response.

An appropriate Order will be entered.

### ORDER

At Wilmington, this *27th* day of August 2009, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. The evidentiary objections of Plaintiff, Sea Star Line, LLC, are ***OVERRULED.***

2. The evidentiary objection of Defendant, Emerald Equipment Leasing, Inc., to CCTr. Exh. 109 is ***SUSTAINED.***

3. In accordance with the procedures set forth in the Memorandum Opinion accompanying this Order, Emerald shall submit a proposed Final Judgment Order consistent with the Court's rulings as set forth in both this Memorandum Opinion and the Opinion issued on September 19, 2008.